# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 20-1361V

|  |  |
| --- | --- |
| RAVITEJA BODEPUDI, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Filed: March 4, 2025 |
| Respondent. | |

*Leah V. Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC,* for Petitioner.

*Katherine C. Esposito, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT[1]

On October 13, 2020, Raviteja Bodepudi filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine he received on October 21, 2019, he suffered a left shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner has carried his burden of proof in establishing that he suffered a Table SIRVA injury, and is therefore entitled to compensation.

## I.    Relevant Procedural History

This claim was initiated on October 13, 2020, and was assigned out of PAR to SPU on October 29, 2020. (ECF Nos. 1, 9). On November 14, 2021, Respondent expressed a willingness to pursue settlement negotiations. (ECF No. 17). The parties spent several months negotiating but eventually reached an impasse. (ECF No. 19). Respondent thereafter filed his contesting Rule 4(c) Report on May 11, 2022. (ECF No. 20). Petitioner filed the instant Motion for Ruling on the Record on June 12, 2023. (ECF No. 26). Respondent filed his Response brief on August 24, 2023. (ECF No. 28). Petitioner filed a reply brief on September 8, 2023. (ECF No. 29). The matter is now ripe for disposition.

## II.    Relevant Medical History

### 1.    Medical Records

Petitioner received the flu vaccine in his left arm on October 21, 2019, during an annual physical exam with his primary care provider ("PCP"), Allan Jonathan Furman, M.D. Petitioner's Exhibit ("Ex.") 1 at 5. The following day, Petitioner alleges, he returned to Dr. Furman complaining of "intense pain in his left shoulder," and Dr. Furman informed him that it would be likely his pain would subside in three to four days, but showed him some home exercises he could do to help with his shoulder. Mot. at 2; Ex. 8 at 1. Petitioner also notes that because Dr. Furman's office considered him a walk-in visitor without an appointment, and because Dr. Furman did not charge Petitioner for this visit, the doctor's office did not create or keep a record of this visit. *Id.*

The first documented post-vaccination visit for Petitioner occurred approximately three weeks later, on November 13, 2019, when Petitioner returned to Dr. Furman and reported "discomfort at the site of [his] recent flu vaccine." Ex. 3 at 13. Petitioner identified the symptoms as emanating from the anterior lateral side of left arm near the shoulder joint. *Id.* at 52. Upon exam, Petitioner displayed full normal passive range of motion ("ROM"). *Id.* at 15. Dr. Furman prescribed Petitioner Meloxicam, a nonsteroidal anti-inflammatory drug. *Id.*

On November 27, 2019 (now five weeks after the vaccination), Petitioner returned to Dr. Furman for a follow-up. Ex. 3 at 9-10. On exam, he had normal passive ROM, no restricted ROM, normal strength, and pain with abduction. *Id.* at 10. Dr. Furman's plan was a follow-up in two weeks if symptoms had not improved and

arrange for physical therapy. *Id.* He prescribed Petitioner prednisone, an oral corticosteroid. *Id.* at 11.

Two days later, on November 29, 2019, Petitioner visited Anita Akpunku, Physician Assistant, at Direct Orthopedic Care. Ex. 2 at 43. Petitioner reported "pain since [his] flu shot." *Id.* On exam, his flexion was 180 degrees with pain, and his abduction was 160 degrees with pain. *Id.* at 47. Petitioner had pain with external and internal rotation, Hawkins test, and Neers test. *Id.* He had no pain posteriorly or anteriorly. *Id.* A subsequent x-ray yielded normal findings and PA Akpunku ordered an MRI without contrast. *Id.* at 46. The MRI results were returned the same day and analyzed by Ashish Monga, M.D., a radiologist, of Akumin Imaging. *Id.* at 55. Dr. Monga's impression was no full-thickness rotator cuff tear, tendinopathy and low-grade interstitial strain in the distal infraspinatus tendon, diffuse teres minor volume atrophy, with attachment of distal teres minor tendon, a subtle signal alteration in the posteroinferior glenoid labrum at seven to eight o'clock, a possible subtle intrasubstance degeneration, and a mild prominence/thickening of the inferior joint capsule suggestive of mild adhesive capsulitis. *Id.* at 54.

On December 23, 2019, Petitioner returned to PA Akpunku for a follow-up. Ex. 2 at 38. Petitioner's exam revealed unchanged results, and  PA Akpunku's impression was adhesive capsulitis of the left shoulder. *Id.* a t  4 1 . PA Akpunku's plan was physical therapy two to three times per week for four weeks. *Id.* She also discussed a subacromial steroidal injection to petitioner's shoulder, which Petitioner declined. *Id* at 42.

From December 30, 2019 to March 26, 2020, Petitioner had twelve physical therapy sessions. Ex. 2 at 8, 10, 12, 15, 18, 21, 24, 26, 28, 30, 33, 35. At the last session on March 26, 2020, Petitioner reported he only had pain while "laying on [the] affected shoulder while sleeping." *Id.* at 8. His ROM had improved. *Id.*

On April 21, 2020, six months after the vaccination, petitioner had a follow-up physical therapy appointment. Ex. 4 at 1. Petitioner again reported that his only pain was while he was laying on his affected shoulder while sleeping. *Id.* Crystal Clark, PT, deemed that skilled physical therapy was no longer necessary. *Id.* Petitioner's shoulder ROM was full and "without pain in all planes." *Id.*

On August 26, 2020, Petitioner returned to Direct Orthopedic Care and saw Brandi Jones, PA. Ex. 5 at 3. Petitioner had significant improvement following physical therapy, with no deficiency noted on exam and only minor discomfort. *Id.* He was advised to continue Meloxicam and continue home exercises provided by the physical therapist. *Id.* at 4.

### 2.  Affidavit Evidence

Petitioner signed two affidavits in support of his claim. The first one, executed on October 21, 2020, describes how he felt abnormal pain at the injection sight approximately three hours after receiving the vaccination. Ex. 6 at ¶ 3. The next day, Petitioner was unable to move his arm up or down without feeing pain, and waited one day before reaching out to his physician, who recommended prednisone and indicated that if the pain persisted, Petitioner would have to see an orthopedist. *Id.* ¶ 4. Petitioner then describes how he continued to have pain which caused him to see an orthopedist, who ordered an x-ray followed by an MRI scan, followed by a recommendation for PT. *Id.*

Petitioner goes on to explain how PT helped his shoulder, but that he was still experiencing pain in daily activities impacting his daily life, including an inability to complete his usually workouts at the gym, and being unable to pick up and play with his one-year old child. *Id.* ¶ 6-7. He also alleges that the pain he felt made it difficult to sleep, which led to increased stress and performance issues at work. *Id.* ¶ 8.

Petitioner's second affidavit, executed June 7, 2023, describes how after receiving the flu vaccination, he started feeling pain within a few hours and after five hours felt significant pain. Ex. 8, ¶ 1. He goes on to describe how he felt pain immediately upon waking up the following morning post-vaccination, visited a hospital without any appointment, how Dr. Furman allowed him to visit during some free time that he had, and how Dr. Furman performed a review of his shoulder, asking him whether he felt pain with certain movements. *Id.* ¶ 2. Petitioner reports that Dr. Furman indicated it might be a frozen shoulder commonly seen after injections and gave Petitioner some home exercises to do to help the pain. *Id.* Petitioner indicates that because Dr. Furman did not bill him for this appointment, no medical record exists from that day. *Id.* ¶ 3.

### III.  **Parties' Respective Arguments**

Petitioner argues that the medical records and affidavits support his claim that his shoulder pain began within the 48 hours of receiving the vaccination. (ECF No. 26). The record, he contends, demonstrates that all applicable QAI's have been met and all elements of a Table SIRVA are established. *Id.* Respondent argues that Petitioner has failed to prove his Table SIRVA claim because he has failed to prove that his pain occurred within 48 hours of vaccine administration. (ECF No. 28).

### IV.  **Applicable Law**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act

Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

 The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V. Analysis

### I. Fact Findings – Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[3] In summary, a petitioner must establish that they received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from their injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for their injury. *See* § 11(c)(1)(A)(B)(D)(E).

(i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health &*

*Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## A.  Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

### 1.  Petitioner has no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of evidence of issues or complaints associated with the affected shoulder prior to vaccination that would explain the symptoms experienced post-vaccination. 42 C.F.R. § 100.3(c)(10)(i). Here, there is no evidence that Petitioner suffered from left shoulder pain before his October 21, 2019 vaccination. Respondent has also not made any argument suggesting he believes that Petitioner had a prior left shoulder condition or injury. Accordingly, Petitioner has met the first QAI requirement.

### 2.  Pain Occurs with the Specified Timeframe (Onset)

A SIRVA petitioner must show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B) and (c)(10)(ii) (QAI criteria)).

Respondent's primary objection to entitlement rests on the argument that Petitioner has failed to demonstrate Table onset. In so arguing, Respondent notes that no record exists of Petitioner's purported visit to his doctor the day after vaccination on October 22, 2019, and the next medical visit (occurring 23 days later on November 13, 2019) is the first record which mentions shoulder pain. Resp. at 4. Respondent thus interprets the totality of the record to show that there are "no objective findings from a physician documenting the presence of shoulder pain in the days immediately following vaccination." *Id.*

In response, Petitioner points to two specific medical records. First, on November 29, 2019 (at Petitioner's first orthopedist appointment), it was reported that Petitioner's symptoms "started approximately 1 month ago after he had a flu shot." Ex. 2 at 43. Petitioner also points to a record generated upon intake for an initial PT evaluation in which it is noted that Petitioner's pain "began directly after his flu shot, and he continues to have significant tenderness at the site of injection." Ex. 2 at 35.

Overall, a review of the record as a whole supports the conclusion that the onset of Petitioner's shoulder pain likely began within 48-hours of vaccination. The records reflect a consistent account of pain beginning shortly after receipt of the vaccine on October 21, 2019. In reporting the origin of his symptoms, it is unlikely that Petitioner anticipated the need for precise specificity of onset. But as noted above there are records consistent with a Table onset, while none suggest an onset outside of two days. Further, Petitioner has offered affidavit evidence from himself in which he describes the onset of his symptoms approximately three to four hours post-vaccination, and his sworn statements do not vary any of the medical records.

Accordingly, based on the record as it stands, Petitioner has carried his burden of proving this QAI requirement.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to His Left Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table requires evidence that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)).

Upon review of the record, it appears that Petitioner's pain and limited ROM was limited to his left shoulder. There are no references that any of Petitioner's symptoms manifested anywhere other than his left shoulder. At most, Respondent seems to argue that the record lacks evidence of *any* range of motion limitations, because "he had full

and normal active and passive range of motion in all of his orthopedic examinations" within a particular timeframe. *Id.* at 4 (citing Ex. 2 at 47, Ex. 3 at 10, 15), 6.

Of course, there is no requirement that loss of ROM manifest simultaneously with onset of pain. And that appears to be the case here. Petitioner's early reported symptoms were focused on pain, and physical examinations did not note any loss of ROM. However, the records of Petitioner's PT clearly display an improvement of ROM. One notes that regarding cervical ROM, "60 degrees rotation L improved to 75 degrees rotation L following tx." Ex. 2 at 8. For Petitioner's ROM to have improved necessarily implies that it was preceded by a loss of ROM.

Accordingly, I find the record contains sufficient proof of loss of ROM, and that Petitioner's pain and limited ROM was limited to his left shoulder, to deem this third QAI requirement satisfied.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Once again, there is insufficient evidence in the record to suggest an alternative cause of Petitioner's left right shoulder issues and Respondent does not argue that there is any evidence of another condition or abnormality. There is no serious contention that Petitioner's initial symptoms were brought on by anything other than his flu vaccination. Accordingly, I find that Petitioner has satisfied the fourth QAI requirement for entitlement.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on October 19, 2019. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or

manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to his left shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id.* Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criterion which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of their shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 21, 2019 (48 hours after vaccination), the records undoubtedly demonstrate that Petitioner experienced symptoms for longer than this timeframe. Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
